# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Alexys Sherry Parker,                                    Civil No. 12-2574 (DWF/TNL)

               Plaintiff,

v.                                                       **MEMORANDUM**
                                                         **OPINION AND ORDER**

Officer Adam Chard and Officer Robert
Illetschko, in their individual and official
capacities; and City of Minneapolis,

               Defendants.

---

Zorislav R. Leyderman, Esq., The Law Office of Zorislav R. Leyderman, counsel for
Plaintiff.

Timothy S. Skarda, Esq., Minneapolis City Attorney's Office, counsel for Defendants.

---

## INTRODUCTION

      This matter is before the Court on a motion for summary judgment brought by

Defendants Officer Adam Chard ("Chard") and Officer Robert Illetschko ("Illetschko")

(together, the "Officers"), and the City of Minneapolis (the "City") (collectively

"Defendants").  (Doc. No. 19.)  This matter is also before the Court on a motion for

partial summary judgment, for Counts I, II, and III, brought by Plaintiff Alexys Sherry

Parker ("Parker" or "Plaintiff").  (Doc. No. 25.)  For the reasons set forth below, the

Court denies in part and grants in part both motions.

## BACKGROUND

Officers Chard and Illetschko are Minneapolis police officers who have been employed as such since 1998 and 1997, respectively.  (Doc. No. 24, Skarda Aff. ¶ 3, Ex. A & Doc. No. 32, Leyderman Aff. ¶ 2, Ex. 1 ("Chard Dep.") at 9-10; Skarda Aff. ¶ 4, Ex. B & Leyderman Aff. ¶ 3, Ex. 3 ("Illetschko Dep.") at 10-11.)  The Officers are partners who were assigned to the Fifth Precinct for the entirety of their careers.  (*Id.*) Specifically, on October 26, 2011, the Officers were assigned to the Fifth Precinct's "Uptown middle watch beat," which is a patrol of the Uptown area in Minneapolis. (Chard Dep. at 12.)  The Officers began their shift at the police station where they spoke with the officer from the day shift, Officer Blauert.  (Chard Dep. at 25.)  Officer Blauert told the Officers that "there were a couple of black females that had just stolen merchandise from Urban Outfitters, which was right next door to Victoria's Secret." (Illetschko Dep. at 16; *see also* Chard Dep. at 25-26.)  Officer Blauert did not give the Officers additional details.  (Illetschko Dep. at 16.)  Before the Officers left the station, the desk officer informed them that they had received a call from the Heartbreaker store, near Victoria's Secret, regarding "potential shoplifting suspects in their store" because a witness had informed the Heartbreaker manager that she had "observed a group of black females run from Victoria's Secret."  (Illetschko Dep. at 19; Chard Dep. at 27-30.)  The Officers then drove from the station to Heartbreaker.  (Illetschko Dep. at 23.)

While on the way to Heartbreaker, Illetschko called Heartbreaker and spoke to the manager who told him that "a witness came up to her and pointed out several black females who were inside of Heartbreaker[]," and that the witness suspected them of

shoplifting at Victoria's Secret.  (Illetschko Dep. at 23-24; Chard Dep. at 32.)  Illetschko

then called Victoria's Secret and asked if black females had run from Victoria's Secret;

the staff member stated that black females were seen running from Victoria's Secret

"very recently" but they "couldn't verify" that anything had been stolen.  (Illetschko Dep.

at 27-29.)

Once at Heartbreaker, the Officers spoke with "Danielle" who told the Officers

that a "customer" had told Dortheo Johnson ("Johnson"), another Heartbreaker employee,

that she suspected a group of black females who were in Heartbreaker of running out of

Victoria's Secret and the customer found the running suspicious and indicative of

shoplifting.  (Illetschko Dep. at 30-34, 36-37; Chard Dep. at 45-46.)  The customer was

not identified, was not present, and did not speak directly with or call the police.

(Illetschko Dep. at 34-36.)  Danielle had called the police, but neither Danielle nor

Johnson had personally observed the running black females or Parker and her friends

involved in any suspicious behavior.  (Illetschko Dep. at 31-32, 37.)  The Officers state

that they personally did not observe suspicious behavior by Parker and her friends as they

left Heartbreaker.  (Chard Dep. at 59; Illetschko Dep. 39-41.)

Around this same time, on October 26, 2011, Parker was in Uptown with her two

female college roommates, Rahel Theodros ("Theodros") and Octavia Cheatom

("Cheatom").  (Doc. No. 32, Leyderman Aff. ¶ 4, Ex. 3 ("Parker Dep.") at 10-12.)  They

arrived in Uptown around 3:40 p.m., for shopping, and parked Parker's car at a meter.

(Parker Dep. at 12-13.)  They split up briefly to go to their respective banks, and then met

at the store Ragstock within fifteen minutes, where they stayed for approximately forty

minutes.  (Parker Dep. at 13-14.)  Parker then went to the Heartbreaker store while her friends paid for their merchandise at Ragstock; they joined Parker at Heartbreaker approximately ten minutes later.  (Parker Dep. at 14.)  Parker states that while she was in Heartbreaker, she heard two employees speaking about the police being in the area to address a shoplifting incident.  (*Id.*)  She heard that there had been an incident at Urban Outfitters earlier.  (*Id.*)  While Plaintiff was in Heartbreaker, she observed a police officer speaking with the Heartbreaker store manager.  (Parker Dep. at 15-16.)  Parker and her friends paid for their merchandise and eventually left Heartbreaker and went to Parker's car; the car was approximately one block from Victoria's Secret.  (Chard Dep. at 64; Parker Dep. at 15.)

As Parker began to pull out of her parking spot, Chard stopped Parker and her friends by pulling his squad car in front of Parker's car and turning on the lights.  (Parker Dep. at 20-21; Chard Dep. at 65-66.)  According to records, Chard ran the registration of Parker's plates when he initiated the stop at 5:34:58 p.m.  (Chard Dep. at 64.)  Chard then exited his squad car and walked to Parker's window.  (Parker Dep. at 21; Chard Dep. at 64, 67.)  Parker rolled down her window and Chard informed Parker and her friends that he was investigating potential shoplifting and that they had been identified as shoplifters at Victoria's Secret.  (Parker Dep. at 21; Chard Dep. at 68-69.)  Parker and her friends stated that they had not been at Victoria's Secret.  (Parker Dep. at 21; Chard Dep. at 69-70.)  The Officers had not viewed video footage from Victoria's Secret prior to stopping Parker and her friends.  (Parker Dep. at 21.)  Chard then asked for permission to search Parker and her friends' shopping bags; they consented and he searched the bags.

4

(Parker Dep. at 22; Chard Dep. at 75.)  At some point during the encounter, Illetschko approached the passenger side of the car and spoke to Theodros who was in the passenger seat.  (Parker Dep. at 23; Chard Dep. at 64.)  The Officers did not find merchandise in Parker's or her friends' bags and agreed that Parker and her friends were not the shoplifters.  (*See* Parker Dep. At 22; *see also* Chart Dep. at 71-75.)

Parker alleges that during the conversation with Chard, he stated that "unfortunately . . . [i]f people like yourself come to this area, you're going to be subjected to things like this," and then said that he was referring to minorities.  (Parker Dep. at 22.)

After initially talking with Parker, Chard requested Parker's identification. (Parker Dep. at 24; Chard Dep. at 71-72.)  The Officers allege that police officers typically identify suspects during any investigative stop.  (Chard Dep. at 72.)  Chard then ran Parker's driver's license number at 5:39:10 p.m.  (Chard Dep. at 39.)  Chard returned to Parker's car and told her that she was "free to leave."  (Chard Dep. at 71, 80.)  While Chard was running Parker's information, she called her father ("Mr. Parker").  (Parker Dep. 24-26.)  When Chard returned to the car, Parker relayed a number of questions to the Officers from Mr. Parker who was on the phone.  (Chard Dep. at 81-83.)  There is a dispute between the parties as to the total amount of time that Parker was detained and not free to leave:  Chard states that Parker was detained and not free to leave for approximately four minutes, (Chard Dep. at 72), Illetschko states that Parker was detained and not free to leave for between 5-10 minutes (Illetschko Dep. at 49), and Parker alleges the stop was approximately 20-30 minutes (Parker Dep. at 35).

At the end of the encounter, Illetschko informed Parker that her meter had run out, but did not issue a ticket at this time.  (Parker Dep. at 25; Illetschko Dep. at 63.)  The Officers did not file a report on the incident.  (Chard Dep. at 84.)  According to the Officers, they do not file reports on investigative stops.  (*Id.*)  The Officers left and went to Victoria's Secret.  (Chard Dep. at 86-87.)  Ultimately, the store video from Victoria's Secret showed the actual suspects put merchandise into their handbags and leave without paying, resulting in approximately $1,000 worth of losses.  (Illetschko Dep. at 65.)

After the Officers left, Parker called her parents, and then waited for them to arrive.  (Parker Dep. at 26.)  They arrived within ten minutes.  (*Id.*)  Parker, her roommates, and her parents then went to Victoria's Secret.  (Parker Dep. at 26-27.)  Parker and her parents spoke with staff at Victoria's Secret who informed them that no theft had been reported for that day, but that there had been a theft reported the previous day.  (*Id.*)  While Parker's group was at Victoria's Secret, the store manager asked the Officers, who were also at Victoria's Secret following up on the possible shoplifting, to speak to Mr. Parker.  (*Id.*; Chard Dep. 86-87.)  At this time, Mr. Parker discussed racial profiling with the Officers in the store.  (Chard Dep. at 88; Parker Dep. at 30-32.)  The parties then moved the conversation outside after a heated exchange.  (*Id.*)  The total conversation was approximately 10 minutes and Parker recorded the conversation.  (Parker Dep. at 30-32.)

Parker testifies that during the incident she was scared and confused and was crying.  (Parker Dep. at 24, 34.)  She states that she felt defeated and humiliated and was also afraid she would be arrested and jailed.  (Parker Dep. at 34-35.)  Parker states that

she has suffered stress, worry, fear, humiliation, and embarrassment as a result of the incident and no longer enjoys shopping or visiting Uptown.  (Parker Dep. at 9-10.)

In her Complaint, Parker asserts the following claims:  (1) unreasonable seizure under 42 U.S.C. § 1983 against the individual defendants; (2) illegal arrest under 42 U.S.C. § 1983 against the individual defendants; (3) unreasonable search under 42 U.S.C. § 1983 against the individual defendants; (4) violation of equal protection under 42 U.S.C. § 1983 against the individual defendants; (5) unreasonable search and seizure, illegal arrest, and violation of equal protection under 42 U.S.C. § 1983 against the City of Minneapolis; (6) Racial Discrimination in violation of Minn. Stat. § 363A.12 against the City of Minneapolis; and (7) false arrest and imprisonment against all Defendants in violation of Minnesota state law.

## DISCUSSION

## I.    Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Unlawful Stop and Seizure

The Fourth Amendment safeguards the rights of individuals against "not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quotation omitted). Courts consider two questions to determine whether searches and seizures are unreasonable: (1) whether the officer's action was "justified at its inception," and (2) whether the action "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.

As to the first question, an officer may lawfully conduct investigative stops, so-called *Terry* stops, but only if the officer has a reasonable suspicion that a vehicle or its occupants are involved in criminal activity. *Terry*, 392 U.S. at 30; *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007). The police officer must have a "particularized and objective basis" for suspecting criminal activity. *Bell*, 480 F.3d at 863. It is well-established that a "hunch" is not enough to establish the necessary reasonable suspicion. *Terry*, 392 U.S. at 27. When examining a reasonable articulable suspicion,

8

courts must examine the totality of the circumstances.  *Id.*  An officer may draw upon his or her experience and training to determine if reasonable suspicion exists.  *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008) (internal citations omitted).  Additionally, other relevant considerations could include whether the location is an area known for criminal activity or other nervous or evasive behavior.  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Reasonable suspicion can be based on an anonymous tip; however, that tip must be both reliable and corroborated.  *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001); *Bell*, 480 F.3d at 863.  "Whether an anonymous tip suffices to give rise to reasonable suspicion depends on both the quantity of information it conveys as well as the quality, or degree of reliability, of that information viewed under the totality of the circumstances."  *Wheat*, 278 F.3d at 726.

In this case, Defendants argue that the Officers' seizure[1] was based on a reasonable suspicion that Parker and her friends had shoplifted.  The Officers contend that the following gave rise to a reasonable suspicion that Parker and her friends may be shoplifters:  the information from Officer Blauert and the desk officer regarding shoplifting in Uptown and a report regarding "African-American females" running from Victoria's Secret; the information from Heartbreaker's manager based on the report of an unidentified customer stating that shoplifting suspects were in her store; the Officers'

---

[1]     The parties do not appear to dispute that the seizure occurred when the Officers stopped Parker and her friends by blocking Parker's car with the police car with its lights on.  Instead, the heart of the dispute relates to whether or not the stop was reasonable.

calls to Heartbreaker and Victoria's Secret confirming that "African-American females" had been seen running out of Victoria's Secret; and the Officers' experience in the area and as long-time Officers. The Court disagrees that this information gave rise to a reasonable suspicion.

First, the "bare report of an unknown, unaccountable informant," without confirmation of reliability and additional corroboration, is not enough to create reasonable suspicion. In *Florida v. J.L.*, the police received an anonymous tip that a black male, wearing a plaid t-shirt, and standing at a certain bus stop, was carrying a gun. 529 U.S. 266, 271 (2000). The Supreme Court held that a stop-and-frisk was unconstitutional because "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the suspect]" lacked a sufficient degree of reliability to justify the stop. *Id.* at 268.

In this case, like in *J.L.*, the police were acting on the report of "an unknown, unaccountable informant" whose reliability was completely unverifiable. 529 U.S. at 271. Nothing was known about this customer or about the information she conveyed, and nothing about the customer's reliability could be tested or examined. *Cf. Bell*, 480 F.3d at 863 (finding that the informant's reliability and credibility *could be* adequately examined when the detective in the case met personally with the informant and the informant was willing to provide his or her own personal information to the police). Here, the customer did not make her report directly to the police so they could ask questions to determine the reliability of the tip, but instead passed the information on to a

10

store employee who was not in the store where the shoplifting occurred, who then told

her manager, who *then* told the police.  The customer did not even leave her name or any

contact information.  At all times, the informant remained completely anonymous to the

police and there was no way to examine her reliability.

The Officers also failed to adequately corroborate the allegation of specific

criminal activity by these specific individuals—Parker and her friends.  "When

suspicions arise not from any observations of police officers but solely from a call made

from an unknown location by an unknown caller whose reputation cannot be assessed,

the police must engage in suitable corroboration of the alleged criminal activity."  *U.S. v.*

*Wells*, 223 F.3d 835, 839 (8th Cir. 2000) (quotations omitted).  If anything, the Officer's

attempts at corroboration should have revealed that they lacked adequate ties between

Parker and her friends and shoplifting activity.  Danielle, the manager at Heartbreaker,

admitted she did not see anyone running from Victoria's Secret, did not personally

observe any suspicious behavior, and had obtained her information from an employee

who, in turn, had obtained her information from an unknown customer.  When the

Officers contacted Victoria's Secret, the employees could not even be sure anything had

been stolen and only stated they "recently" had a group of people run from their store.

(Illetschko at 28-29.)  The Officers themselves admit they did not personally observe any

suspicious or illegal activity by Parker and her friends at any time.  (Chard Dep. at 59;

Illetschko Dep. at 40-41.)  Additionally, Parker and her friends were then seen *paying* for

merchandise at a second store.  The record does not reflect any further details of the

alleged shoplifters or any other verification obtained by the Officers.  Based on this

record, the Court finds that the customer's tip was neither sufficiently reliable nor sufficiently corroborated.

Second, the case law is also clear that the identification of "visible attributes" is not sufficient to establish reasonable suspicion.  In this case, unfortunately, only the race and gender of the alleged suspects were identified.  This is not enough to justify a *Terry* stop.  *J.L.*, 529 U.S. at 271; *see also Terry*, 529 U.S. at 271; *United States v. Wells*, 223 F.3d 835, 840 (8th Cir. 2000) (finding that an anonymous tipster's information regarding a "dark colored vehicle" was unreliable); *United States v. Smith*, Civ. No. 07-318, 2007 WL 4461034, at 2-4 (D. Minn. 2007) (holding that an anonymous tip based on a generic description of the suspects, three armed black males, and a generic description of their vehicle, a white Buick Century, was not enough to give rise to a reasonable suspicion).  When the customer reported that she saw black females running out of Victoria's Secret, and she believed Parker and her friends were those females, she did not offer any information connecting the two—only the fact that they were "black females."  This "identification" was no different from pointing to a "black male" in a "plaid shirt," and, in fact, was arguably less specific here because the customer offered no identifiers like the clothing the alleged suspected shoplifters were wearing.  Significantly, based on the record, whether the customer actually saw *Parker and her friends* running from Victoria's Secret cannot be verified.  At best, the customer reported that she saw black females running which she believed to be suspicious, and then, at Heartbreaker, she saw some black females.  This amounts to the mere "hunch" of an unidentified customer based on visual attributes. *See Terry*, 392 U.S. at 27.  Again, the fact that the customer

pointed directly to Parker, as Defendants repeatedly point out, does not change the fact that the customer did not see anything but "black females" running.  This is precisely the type of identification *Terry* and *J.L.* seek to avoid.

Third, an anonymous tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person."  *J.L.*, 529 U.S. at 272.  None of the information possessed by the Officers related to the illegal act of shoplifting itself.  At best, an unidentified customer pointed to Parker and her friends as having allegedly run out of Victoria's Secret.  The customer viewed this as suspicious, but this still fails to show that the customer had any knowledge of any criminal activity.  Running out of a store is not an illegal activity.

Defendants argue that *J.L.* stands only for the narrow proposition that a *bare* report by an unidentifiable tipster *alone* is insufficient to create reasonable suspicion and that, in this case, the Officers had much more information than just the customer's tip. Defendants urge the Court to look at the fact that the Officers used their years of experience in forming their reasonable suspicion and also considered the information provided by the desk officer and Officer Blauert.  Defendants also remind the Court that all of the information must be viewed under the totality of the circumstances.  However, despite all of the information Defendants' allege the Officers had (information from the desk and beat officer, their experience, and knowledge of the Uptown area and how shoplifting actors work), the Officers still had nothing more than generic, non-specific, uncorroborated information and cannot verify the reliability of the customer's report. Parker and her friends were not identified as shoplifters based on specific knowledge of

shoplifting, but instead were identified as suspected shoplifters based on someone

viewing "running" and "black females."  In reality, the customer's conclusory report is

the only thing connecting Parker and her friends to the alleged shoplifting event at

Victoria's Secret and, without the customer's tip, the Officers would not have targeted

Parker and her friends.  Thus, the tip's critical role, though not the only factor, is the

predominant factor in this case, and, as such, this Court gives it substantial weight in its

analysis.

Finally, Defendants noted at oral argument that if the Officers had found

shoplifted goods in Parker and her friends' bags, this case would be viewed differently.

However, the Supreme Court addressed this issue in *J.L.*:

> That the allegation about the gun turned out to be correct does not suggest
> that the officers, prior to the frisks, had a reasonable basis for suspecting
> *J.L.* of engaging in unlawful conduct:  The reasonableness of official
> suspicion must be measured by what the officers knew *before they
> conducted their search*.

529 U.S. at 271 (emphasis added).  The same is true here—whether Parker and her

friends actually shoplifted (which they did not), is not relevant to the analysis of whether

the Officers had a reasonable basis for suspecting Parker and her friends.  The

information the Officers had before the search and seizure was insufficient as a matter of

law to establish a reasonable suspicion sufficient to justify a *Terry* stop.  Even when

viewed in the light most favorable to Defendants and considering the totality of the

circumstances, the Court concludes that no reasonable juror or Officer could find that the

Officers had a reasonable articulable suspicion sufficient to justify their stop and seizure

of Parker and her friends.

14

The Court also concludes that the Officers' claim of qualified immunity fails.  In the Eighth Circuit, on a motion for summary judgment, the Court employs a three-part test to determine whether qualified immunity exists.  *Mettler v. Whitledge*, 165 F.3d 1197, 1202 (8th Cir. 1999) (internal citations omitted).  First, the plaintiff must assert a violation of a constitutional right.  *Id.*  Second, the alleged right must be clearly established.  *Id.*  Third, taking the facts in the light most favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated the plaintiff's clearly established rights in light of the law and information they possessed at the time.  *Id.*

As described in detail above, Plaintiff has adequately asserted and established as a matter of law that the Officers' actions were not based on a reasonable suspicion and thus violated Parker's Fourth Amendment right to be free from unreasonable seizure.  Second, it is not disputed that the law with respect to this right was clearly established at the time of the violation.  Third, a reasonable officer would have known that seizing Parker and her friends in the absence of a reasonable articulable suspicion violated clearly established Fourth Amendment principles.  As a result, Defendants' motion for summary judgment on the basis of qualified immunity and/or a reasonable stop and seizure for Count I is denied, and Plaintiff's motion for partial summary judgment on the basis of an unreasonable stop and seizure by the Officers for Count I is granted. [2]

---

[2]     Plaintiff also argues that the Officers' actions exceeded the permissible scope of the *Terry* stop which converted an otherwise lawful stop into an unlawful one.  Given the Court's conclusion that the stop itself was unreasonable based on the lack of a reasonable

(Footnote Continued on Next Page)

### III.    Unlawful Search

"Law enforcement officers do not violate the Fourth Amendment by asking a person for consent to search or other types of cooperation, even when they have no reason to suspect that person, 'provided they do not induce the cooperation by coercive means.'"  *United States v. Yang*, 345 F.3d 650, 654 (8th Cir. 2003) (quoting *United States v. Drayton*, 536 U.S. 194, 201 (2002)).  A citizen need not be notified that she is free to refuse to cooperate for consent to be valid.  *United States v. Montano-Gudino*, 309 F.3d 501, 504 (8th Cir. 2002) (citing *Drayton*, 536 U.S. at 196).  A party can consent to a search, even if the activity leading up to the search was unlawful.  *See*, *e.g.*, *United States v. Becker*, 333 F.3d 858, 860-63 (8th Cir. 2003) (finding voluntary consent to a search though it was preceded by an illegal police action).  To determine whether the consent was voluntary, courts must consider whether, in light of the totality of the circumstances, consent was given without coercion, express or implied.  *See Yang*, 345 F.3d at 654; *see also United States v. Yousif*, 308 F.3d 820, 830 (8th Cir. 2002) (listing factors to be considered when determining if consent was voluntary, including the timing of the illegal act and the consent, the presence of intervening circumstances, and the nature of the official misconduct).

---

(Footnote Continued From Previous Page)
articulable suspicion and that the stop was unlawful as a result, the Court declines to examine the question of whether the Officers' actions were also unreasonable in scope with respect to the seizure.  However, the Court does note that the Officers had a number of other means for questioning Parker and her friends available to them.  For example, the Officers could have requested Parker's consent to search their bags while in Heartbreaker, rather than blocking Parker and her friends with the police car and questioning them.

Plaintiff argues that because the initial seizure was unreasonable and unlawful, everything that happened during the seizure, including the request to search and the actual search of Parker's bags, was unlawful under the Fourth Amendment. Defendants, however, argue that the search was not unreasonable because Parker and her friends consented to the search. Defendants also argue that they are entitled to qualified immunity on this claim.

The Court finds no law to support Plaintiff's proposition that an unlawful seizure automatically renders unlawful *any* activity thereafter. Thus, in this case, the appropriate question on this issue is whether Parker's consent was "free and voluntary."

Plaintiff cannot establish as a matter of law that the search was unlawful and that Parker's consent was not voluntary. Chard asked Parker if he could search the shopping bags that were in plain view, and Parker consented. Parker does not deny that she consented and does not point to specific facts that her consent was involuntary. Additionally, Parker does not allege that Chard used any coercive means to compel the search. Thus, Parker's motion for summary judgment as to the unreasonable search claim is denied.

Defendants also move for summary judgment as to this claim on the grounds of qualified immunity. A government defendant is shielded from civil liability if it is shown that his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Mettler v. Whitledge*, 165 F.3d at 1202 (outlining the three requirements for qualified immunity) (laid out in detail in Section II, *supra*).

17

With respect to the search, taking the facts in the light most favorable to the plaintiff, Parker cannot show a genuine issue of material fact as to whether a reasonable official would have known that the alleged action violated her clearly established rights. Parker states that she consented to the search after the Officers asked whether they could conduct the search, and does not allege any coercion.  Because there is no clearly established violation, and because Parker presents no question of fact on this issue, Defendants are protected by qualified immunity with respect to the search.  Thus, Parker's motion for summary judgment as to the unreasonable search claim (Count III) is denied, and Defendants' motion for summary judgment as to the unreasonable search claim (Count III) is granted.

## IV.   Illegal Arrest

Defendants move for summary judgment regarding Plaintiff's claim for illegal arrest or unlawful continued detention against the officer-defendants (Count II).

In this case, given the Court's holding that the stop and seizure were unlawful and because the entire encounter occurred over a single span of time with the same underlying facts, the Court dismisses the claim for illegal arrest (Count II) as moot.

## V.   Violation of Equal Protection

Defendant also moves for summary judgment on Parker's claim that the Officers violated her right to Equal Protection when they "treated [her], an African-American, differently and improperly on the basis of her race and/or skin color by targeting, seizing, detaining, and arresting her without probable cause or reasonable articulable suspicion." (Compl. ¶ 54.)

"[T]he Equal Protection Clause requires that state actors treat similarly situated people alike." *Habhab v. Hon,* 536 F.3d 963, 967 (8th Cir. 2008) (quoting *Bogren v. Minnesota,* 236 F.3d 399, 408 (8th Cir. 2000)).   "State actors may, however, treat dissimilarly situated people dissimilarly without running afoul of the protections afforded by the clause." *Id.*   To survive summary judgment, a plaintiff must show some evidence that officers' conduct had a discriminatory effect and that officers were motivated by a discriminatory purpose. *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003) (internal citations omitted).   Typically, a plaintiff must show that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose. *Id.*

Parker's briefing does not address her Equal Protection claims and appears to only address Defendants' motion for summary judgment as to Counts I, II, and III.   Here, the Court concludes that the Officers' actions do not rise to the level of a violation of Parker's right to Equal Protection.   Presumably Parker would point to Chard's statement that "unfortunately" minorities are "going to be subjected to things like this" when coming to an area like Uptown to show that the Officers were motivated by a discriminatory purpose.   (Parker Dep. at 22.)   Parker, however, conceded that the comment was not reflective of Chard's personal opinion and was made in reference to people reporting African-Americans as shoplifters.   This, however, is the extent of the evidence presented.   There is no other evidence to suggest that the Officers were motivated by a discriminatory intent.   There is no evidence that without the specific identification by the customer, the Officers would have stopped Parker and her friends or

that they were planning to stop all "black females."  Moreover, Parker fails to present any evidence, or even any allegations, that the Officers failed to stop other similarly situated individuals, and so this claim must fail as a matter of law.  Defendants' motion for summary judgment on Parker's equal protection claim (Count IV) is therefore granted.

## VI.   *Monell* Claim

Defendants also move for summary judgment regarding Plaintiff's claims of unreasonable search and seizure, illegal arrest, and equal protection against the City of Minneapolis (Count V).

It is well-established that a governmental entity cannot be held liable under § 1983 on a respondeat superior theory.  *See Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691 (1978).  Thus, a government body cannot be held liable under § 1983 merely because it employs a tortfeasor.  *Id.* at 691–92.  For a municipality to be liable under § 1983, a plaintiff must prove that a municipal policy or custom was the "moving force [behind] [a] constitutional violation."  *Id.* at 694.  Specifically, a plaintiff must identify a policy that is constitutionally deficient and must show that employees complied with the policy, thereby causing a constitutional violation.  *Kuha v. City of Minnetonka,* 365 F.3d 590, 603–605 (8th Cir. 2003), *abrogated on other grounds by Szalba v. City of Brooklyn Park,* 486 F.3d 385 (8th Cir. 2007).

Again, Parker's briefing does not address these claims from Count V and appears to only address Defendants' Motion for summary judgment as to Counts I, II, and III. And, Parker has not pled any facts that show there was any municipal policy or custom that resulted in her alleged constitutional violations.  As a result, the Court grants

Defendants' motion for summary judgment as to Parker's Count V claims against the City of Minneapolis.

## VII.   Racial Discrimination

Defendants also move for summary judgment regarding Plaintiff's state-law claims for racial discrimination in violation of Minn. Stat. § 363A.12 against the City of Minneapolis (Count VI).

Claims of discrimination are analyzed within the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Cannon v. Minneapolis Police Dept.*, 783 N.W.2d 182, 189 (Minn. Ct. App. 2010) (citations omitted).  A three-part analysis is applied.  *Hasnudeen v. Onan Corp.*, 552 N.W.2d 555 (Minn. 1996).  First, the plaintiff must demonstrate a prima facie case of discrimination.  *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444-45 (Minn. 1983).  Defendants are then given an opportunity to "proffer a non-discriminatory justification for its actions."  *Id*. at 445.   If such a justification is proffered, the plaintiff then bears the burden of demonstrating that justification is a pretext for discrimination.   *Id*.  To establish a prima facie case, the claimant must "introduce evidence showing that:  (1) the claimant is a member of a protected class; (2) the claimant was subjected to adverse and unreasonable treatment; and (3) the treatment was caused by a discriminatory consideration of race."  *Kelly*, 776 N.W.2d at 766.

Parker's briefing again does not address this claim (Count VI) and appears to only address Defendants' motion for summary judgment as to Counts I, II, and III.  In addition, Parker cannot meet her burden of showing causation or pretext on this claim.

Parker does not present facts that the Officers themselves were acting on the discriminatory consideration of race. (Parker Dep. at 23.) Instead, the Officers were acting on an unidentified customer's identification. Any discriminatory motivation on the part of the customer was separate and distinct from the motivation of the Officers themselves. As a result, the Court grants Defendants' motion for summary judgment as to Parker's Count VI claim against the City of Minneapolis.

## VIII.   False Arrest and False Imprisonment

Defendants move for summary judgment regarding Plaintiff's state-law claims for False Arrest and Imprisonment against all Defendants (Count VII).

Parker again fails to address these counts in her briefing. In addition, like the illegal arrest claim (Section IV, *supra*), given the Court's holding that the stop and seizure were unlawful and because the entire encounter occurred over a single span of time with the same underlying facts, the Court dismisses the state-law claims for False Arrest and Imprisonment (Count VII) as moot.

## IX.   Emotional Suffering Damages

Compensatory damages are available in a Section 1983 action upon proper proof—that is proof of actual injury. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (citing *Carey v. Piphus*, 435 U.S. 247, 264 (1978)). Compensatory damages can be awarded for emotional and mental distress. *Stachura*, 477 U.S. at 307.

Defendants argue that in this case, Parker is not entitled to relief because she fails to articulate her emotional suffering with sufficient specificity. The Court disagrees. While the Court notes that Parker has barely shown a genuine issue of material fact, she

has sufficiently done so to overcome summary judgment on this issue.  Parker testifies that she was scared, confused, defeated, and started to cry during the encounter.  Parker felt she was the victim of racial discrimination and was humiliated, embarrassed, and was scared of being arrested and jailed.  Finally, she has testified that she has suffered stress, worry, fear, humiliation, embarrassment, and no longer wishes to go to Uptown as a result of the encounter.  This is sufficient to create a question of fact.[3]

## CONCLUSION

For the reasons discussed above, the Court concludes that Parker has established unreasonable seizure as a matter of law and grants Parker's motion for summary judgment as to this claim (Count I).  As to all of Plaintiff's other claims, and Defendants' motion for summary judgment relating to the remaining six counts, Parker's claims are all dismissed with prejudice and Defendants' motion is granted.  Regarding Plaintiff's claims with respect to damages, the Court finds that, while sparse, Plaintiff's allegations are sufficient to overcome summary judgment with respect to emotional injuries.

## ORDER

Based upon all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that, on the issue of liability, the Court orders the following:

---

[3]    While the Court wishes in no way to minimize the trauma that might result from such an encounter, the Court notes that the evidence on the record regarding emotional suffering is extremely sparse.  Additionally, although Defendant has not moved for summary judgment as to punitive damages, the Court further notes that Parker does not appear to have shown any evidence that the Officers' actions were motivated by so-called evil motive or intent in a way that would support a claim for punitive damages.

1.    Defendants' motion for summary judgment (Doc. No. [19]) is **DENIED IN PART**, and **GRANTED IN PART** as follows:

a.    With respect to Count I against the individual officer defendants, Defendants' motion is **DENIED**;

b.    With respect to Counts III and IV against the individual officer defendants, Defendants' motion is **GRANTED**;

c.    With respect to Counts V and VI against the City of Minneapolis, Defendants' motion is **GRANTED**; and

d.    With respect to Count II against the individual officer defendants and VII against all Defendants, the claims are **DISMISSED AS MOOT**;

e.     Therefore, Counts II, III, IV, V, VI, and VII are **DISMISSED WITH PREJUDICE.**

2.    Plaintiff's partial motion for summary judgment (Doc. No. [25]) is **DENIED IN PART**, and **GRANTED IN PART** as follows:

a.    With respect to Count III against the individual officer defendants, Plaintiff's motion is **DENIED**;

b.    With respect to Count II against the individual officer defendants, this claim is **DISMISSED AS MOOT**; and

        c.      With respect to Count I against the individual officer

defendants, Plaintiff's motion is **GRANTED**.


Dated:  February 10, 2014              s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge